873 F.2d 536
 27 Fed. R. Evid. Serv. 1177
 ENERCOMP, INC., Stephen Flaks and Javid Corporation,
Plaintiffs-Appellees,
v.
McCORHILL PUBLISHING, INC., Gerald H. Cahill, the Cahill
Trust, George McPhillips, Terence Corwin, Harris
Freedman, S & H Business Consultants and
Meridian Productions, Inc.,
Defendants.
Appeal of Harris FREEDMAN, McCorhill Publishing, Inc.,
Meridian Productions, Inc., Terence Corwin, George
B. McPhillips and the Cahill Trust,
Defendants-Appellants.
 Nos. 82, 83, 108 and 109, Dockets 88-7323, 88-7349, 88-7353
and 88-7357.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 31, 1988.
Decided April 11, 1989.
 
 1
 Paul Chernis, New York City (Richard Feiner, Nina Hutchison, Lowy & Chernis, P.C., New York City, of counsel), for defendants-appellants McCorhill Pub., Inc. and Meridian Productions, Inc.
 
 
 2
 Joseph Stim, Huntington, N.Y. (Stim & Warmuth, P.C., Huntington, N.Y., of counsel), for defendant-appellant Harris Freedman.
 
 
 3
 Linda B. Cahill, New York City (George B. McPhillips, McPhillips & Brady, P.C., Mineola, N.Y., of counsel), for defendants-appellants Terence Corwin, George B. McPhillips and The Cahill Trust.
 
 
 4
 William B. Gazi, Iselin, N.J. (Foley, Gazi & Jorgenson, Iselin, N.J.), for plaintiffs-appellees Enercomp, Inc., Stephen Flaks and Javid Corp.
 
 
 5
 Before OAKES, Chief Judge, NEWMAN, Circuit Judge, and REENA RAGGI, District Judge.*
 
 REENA RAGGI, District Judge:
 
 6
 This case has its origin in the parties' unsuccessful 1984-85 attempt to merge Enercomp, Inc. with McCorhill Publishing, Inc. McCorhill and its individual stockholders, George B. McPhillips, Terence R. Corwin and the Cahill Trust ("McCorhill stockholders") appeal from a final judgment of $500,000 entered against them on December 11, 1987 by Judge Cannella after a jury in the Southern District of New York found them liable for breach of contract. Harris Freedman, who acted as a broker between the parties in the merger efforts, and Meridian Productions, Inc., the company with which McCorhill eventually merged, appeal from a judgment of joint and several liability in the same case for tortious interference with contract.
 
 
 7
 Appellants' arguments are myriad. They contend that the district court erred in limiting proof and precluding argument as to a $70,000 contingent liability of Enercomp that bore on that company's ability to comply with certain conditions for merger. McCorhill, its stockholders and Meridian separately argue that the district court improperly exercised pendent jurisdiction over state law contract and tort claims after it dismissed Enercomp's federal securities action at the close of plaintiffs' case. In the alternative, they argue that insufficient evidence was adduced to support a finding of a binding contract, that in any event they were justified in repudiating any merger agreement, that both the jury instructions and the interrogatories submitted to the jury were deficient, that expert testimony on damages was improperly admitted, and that damages were recovered on an impermissible theory. The McCorhill stockholders contend that, even if there was sufficient evidence of a binding contract, an indemnification clause in the merger agreement relieves them of any liability. Finally, Freedman and Meridian challenge the sufficiency of the evidence that they acted in tortious interference of any contract rights.
 
 
 8
 Because we agree with Freedman and Meridian that the evidence was insufficient to take the tortious interference claim to the jury, we direct that this claim be dismissed. Furthermore, because the limitations imposed on counsel with respect to proving and arguing the implications of the $70,000 lien unduly prejudiced appellants, we reverse and remand for a new trial on the breach of contract claim.
 
 Factual Background
 1. The Enercomp-McCorhill Merger
 
 9
 In the summer of 1984, Enercomp, acting through its president, Stephen Flaks, entered into negotiations with McCorhill concerning a possible merger of the two companies through an exchange of shares. At the time, Enercomp was a publicly-held shell company in the process of spinning off its only operating subsidiary, Metropolitan Compactors. McCorhill was a private company recently formed for the purpose of acquiring certain assets and property of Kraus Thomson Organization, Ltd., a specialty book publisher.
 
 
 10
 A merger was advantageous to both sides. McCorhill, through its acquisition of Kraus Thomson, would provide Enercomp with an operating business to enhance the value of its stock. Enercomp, as a public company registered with the Securities and Exchange Commission, could raise funds for McCorhill through stock offerings. Indeed, there were then outstanding stock warrants for Enercomp that could bring as much as $1.8 million into the company, particularly if public optimism over its merger with McCorhill and the latter's acquisition of Kraus Thomson drove up the market price for Enercomp's stock. Further, Enercomp had a tax loss carry forward of approximately $200,000 that could shield any initial profits derived from the Kraus business.
 
 
 11
 McCorhill, however, needed approximately $250,000 in additional funding to complete its $7.75 million transaction with Kraus Thomson. Harris Freedman, an Enercomp shareholder who was serving as a broker between Enercomp and McCorhill, proposed to Flaks and to McCorhill's Chairman, Gerald Cahill, that a number of Enercomp's current shareholders lend McCorhill $250,000. Then after McCorhill acquired Kraus Thomson, Enercomp and McCorhill would effect their own merger.
 
 
 12
 Enercomp shareholders did eventually lend McCorhill $250,000, although apparently not in time for the July 1984 closing on Kraus Thomson. The monies for this deal were obtained elsewhere. Nevertheless, McCorhill insisted upon the loan as evidence of Enercomp's commitment to the merger. As an inducement to its shareholders to make the loan to McCorhill, Enercomp issued them 400,000 shares of stock for $.10 per share, thereby increasing their equity interest.
 
 
 13
 Optimistic about a joint future, the presidents of Enercomp and McCorhill and the McCorhill stockholders executed a 26-page "Agreement" in August of 1984. The agreement, drafted by Enercomp's attorney, provided that all of McCorhill's stock would be exchanged for 5,896,224 shares of Enercomp common stock, such amount to total 51% of Enercomp's outstanding shares after all warrants had been exercised and certain shares issued to Freedman for his role in the merger. The agreement did not fix a closing date for the merger, although it was apparently understood that closing would take place after McCorhill completed the Kraus Thomson acquisition. Indeed, this acquisition was expressly a condition precedent to the Enercomp-McCorhill merger. Until closing, both companies agreed not to take certain actions with respect to their stock and not to make any capital expenditure exceeding $1,000 except by mutual consent. Although current financial statements were called for in the agreement, none was in fact attached, presumably because Enercomp, still affiliated with Metropolitan Compactors, was not able to provide an independent statement. Section 5(i) of the agreement, however, expressly provided that Enercomp was to have "no substantial liabilities" not disclosed in its final balance sheet. The parties also agreed that their merger was "subject to approval by any qualified experts Enercomp may wish to engage to evaluate McCorhill and the business of Kraus it seeks to acquire." No reciprocal clause provided for a McCorhill expert to evaluate Enercomp.
 
 
 14
 In April 1985, McCorhill repaid with interest the loan made by Enercomp's shareholders. On April 9, 1985, Enercomp publicly announced the plan to merge with McCorhill, the exchange of shares to be completed on April 16, 1985. In fact, no closing took place on that date, due at least in part to Enercomp's failure to provide a balance sheet independent of its subsidiary, Metropolitan Compactors, as required by the merger agreement.
 
 
 15
 Concerned about Enercomp's financial status, Gerald Cahill employed a certified public accountant to audit Enercomp. In the summer of 1985, Cahill learned that Enercomp had an outstanding printer's bill of $61,000 from a previous public offering. Cahill demanded that at the time of merger Enercomp be a "clean shell" with no outstanding liabilities and with $20,000 in assets to meet attorneys' fees incurred in the merger. Flaks sought to assure him that the printer's bill would be covered by the assignment to Enercomp of a performance bond due Metropolitan Compactors. It was soon discovered, however, that this bond was tied up in an unrelated bankruptcy proceeding. Nevertheless, by August 1985, Enercomp had reduced its printer's bill to $35,000. A subsequent proposal provided for five Enercomp shareholders, including Flaks and Freedman, to sign personal guarantees of $7,000 each to cover this outstanding liability. The parties set a closing date, scheduled a pre-closing meeting and prepared a list of documents needed for closing. Ultimately, however, the personal guarantees on the $35,000 liability were not signed and the merger never took place.
 
 
 16
 At trial, the parties sharply disputed the reasons for the termination of their relationship. Defendants contended that Flaks refused to sign the $7,000 personal guarantee, the last in a series of acts that had undermined their confidence in the financial condition of Enercomp. Flaks, on the other hand, testified that he was always willing to sign the guarantee, provided the other shareholders did so as well. Indeed, he recalled agreeing to a number of additional demands communicated to him by Freedman in 1985 that went beyond the terms of the original 1984 agreement, including "locking up" certain of his Enercomp stock and putting other shares in escrow. Only when Freedman told Flaks that Cahill wanted him to give back 200,000 of his Enercomp shares did Flaks refuse. Shortly thereafter, in a letter dated September 20, 1985, McCorhill advised Enercomp's attorney that it was terminating the companies' relationship.
 
 
 17
 On October 4, 1985, McCorhill signed a letter of intent to merge with defendant Meridian, the company of which Freedman was president and a major shareholder. Meridian and McCorhill completed their merger on November 15, 1985.
 
 2. The Trial
 
 18
 Enercomp, Stephen Flaks and his consulting company, Javid Corporation, pursued six causes of action at trial. The sole basis for federal jurisdiction was an alleged violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b) (1982), and Rule 10b-5, 17 C.F.R. Sec. 240.10b-5 (1988). Five days prior to the scheduled commencement of trial, defendants moved to dismiss this claim. The district court denied the motion in a memorandum and order dated November 6, 1986. The remaining claims, all based on state law, alleged: (1) common law fraud, (2) breach of contract, (3) breach of fiduciary duty by Freedman and his consulting company, S & H Business Consultants, (4) tortious interference with contract by Freedman and Meridian, and (5) breach by McCorhill and Gerald Cahill of a separate consulting agreement, whereby Flaks and Javid were to be retained as consultants for two years by the surviving merged company at the rate of $1,500 per month.
 
 
 19
 At the close of plaintiffs' case, the district court dismissed the securities and common law fraud claims. Although no reasons are expressly stated, a review of the record indicates that plaintiffs were unable to adduce evidence that defendants acted fraudulently in connection with any purchase or sale of securities. As to the remaining claims, the jury found McCorhill, Gerald Cahill and the McCorhill stockholders jointly and severally liable in the amount of $1,161,000 for breach of contract, and Freedman and Meridian jointly and severally liable in the same amount for tortious interference with contract. It found Freedman and S & H Business Consultants liable in the amount of $216,000 for breach of fiduciary duty. It exonerated Gerald Cahill on the claim of breach of a separate consulting contract, but held McCorhill liable for $36,000 damages on this claim.
 
 3. Post-Trial Motions
 
 20
 In considering defendants' post-trial motions for judgment notwithstanding the verdict or, in the alternative, for a new trial, the district court, in a carefully-reasoned memorandum and order dated August 27, 1987, set aside the breach of contract verdict against Gerald Cahill and the breach of fiduciary duty verdict against Freedman and S & H Business Consultants. The motions were denied in all other respects on condition that plaintiffs accept a remittitur to $500,000. This was agreed upon, and judgment was entered in that amount.
 
 Discussion
 I. Tortious Interference
 
 21
 To recover for tortious interference with a contract under New York law, a complainant must prove the existence of a valid contract between the plaintiff and a third party, the defendants' knowledge of that contract, and defendants' improper intentional interference with its performance. Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 189-91, 428 N.Y.S.2d 628, 631-32, 406 N.E.2d 445, 447-49 (1980); S & S Hotel Ventures Ltd. Partnership v. 777 S.H. Corp., 108 A.D.2d 351, 354, 489 N.Y.S.2d 478, 480 (1st Dep't 1985); see also Universal City Studios, Inc. v. Nintendo Co., 797 F.2d 70, 75 (2d Cir.), cert. denied, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986). Improper intentional interference is generally evidenced by a tortfeasor "inducing or otherwise causing [a] third person not to perform" his contractual obligations to plaintiff. Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d at 189, 428 N.Y.S.2d at 631, 406 N.E.2d at 447 (quoting Restatement (Second) of Torts Sec. 766 (1977)).
 
 
 22
 Freedman and Meridian argue that no evidence was presented to support a finding that they induced McCorhill's repudiation of its agreement with Enercomp. In reviewing the district court's denial of defendants' motion for judgment notwithstanding the jury's verdict finding tortious interference, we must apply the same standard of review as the district court, i.e., the jury's verdict cannot be disturbed unless we can say, without considering either the credibility of witnesses or the weight their testimony deserves, that the only conclusion a reasonable factfinder could have reached is one favoring defendants. Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 367 (2d Cir.1988); Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966, 970 (2d Cir.1987); Mattivi v. South African Marine Corp., 618 F.2d 163, 167 (2d Cir.1980). In this case, we find that the only reasonable verdict in light of the evidence would have been one in favor of Freedman and Meridian.
 
 
 23
 The uncontradicted testimony of various McCorhill officials was that Freedman did nothing to encourage McCorhill to abandon the merger. To the contrary, up until September 20, 1985, all Freedman's efforts were directed toward holding the Enercomp-McCorhill deal together. Of course it was Freedman who conveyed to Flaks the increasing demands of Gerald Cahill--not reflected in the 1984 merger agreement--to effect a closing. It was Flaks' refusal to agree to these demands that ultimately led Cahill, on behalf of McCorhill, to abandon the merger. To this extent, Freedman was not simply a bystander in the events that led to McCorhill's repudiation of the agreement. But implicit in tort is the notion of some wrongful or improper conduct. Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., supra. The accurate communication of one person's position to another does not constitute improper conduct, at least in a case like this where Freedman, as Enercomp's broker, had a duty to keep his client apprised of any changes--however unwelcome--in the position of its contemplated merger partner. Certainly, nothing in the record demonstrates that Freedman suggested to or induced Gerald Cahill to make increased demands of Flaks, or otherwise poisoned their relationship in such a way as to precipitate McCorhill's repudiation of the merger.
 
 
 24
 The trial court focused on the relatively short time between McCorhill's repudiation of its merger agreement with Enercomp and its entry into such an agreement with Freedman's company, Meridian, as sufficient evidence to support a jury inference that Freedman intended to interfere with the Enercomp-McCorhill merger. We do not agree. While the speed with which Freedman and Meridian were able to profit from the repudiation of the merger agreement undoubtedly made it appropriate to consider Freedman's pre-repudiation conduct with care, absent some evidence that he took steps to induce McCorhill to abandon its agreement with Enercomp, the jury was not free to speculate that such was the case. Cf. Bauer v. Raymark, 849 F.2d 790 (2d Cir.1988) (verdict cannot be premised on surmise or conjecture unsupported by any evidence). Freedman's own testimony that he did not propose a merger between McCorhill and Meridian until after September 20, 1985 was uncontradicted.
 
 
 25
 We thus conclude that even if Freedman was secretly pleased to have the Enercomp-McCorhill merger plans dissolve, even if he thought that Gerald Cahill's demands were likely to lead to such a result, and even if he was more than willing to pick up the pieces to his own advantage after the repudiation, tortious interference is not established simply from evidence that he accurately communicated Cahill's increased demands to Flaks.
 
 
 26
 The jury's verdict in favor of Enercomp on the claim of tortious interference is reversed.
 
 II. The Summit Trust Lien
 
 27
 Throughout the trial, defendants sought to introduce evidence pertaining to Enercomp's guarantee of Metropolitan Compactors' $70,000 obligation to the Summit Trust Company. We agree that the district court's limitation on this proof and its refusal to allow argument by defendants on the issue warrant reversal.
 
 
 28
 Decisions as to the relevancy and cumulativeness of evidence are generally left "to the sound discretion of the trial judge, and his decision will not be overturned unless he has acted arbitrarily or irrationally." United States v. Cruz, 797 F.2d 90, 95 (2d Cir.1986); see O'Rourke v. Eastern Airlines, Inc., 730 F.2d 842, 854 (2d Cir.1984). Similarly, the propriety of comment by counsel in closing argument is best evaluated, in most instances, by the trial judge. Exclusion, even of permissible comment, will generally not warrant granting a new trial unless actual prejudice results. Chicago College of Osteopathic Medicine v. George A. Fuller Co., 719 F.2d 1335, 1353 (7th Cir.1983).
 
 
 29
 Of course, the question of prejudice need only be addressed if the Summit Trust lien was in fact relevant to an issue in the case. To establish breach of contract, plaintiffs were required to prove by a preponderance of the evidence that: (1) a contract was formed between Enercomp and McCorhill; (2) Enercomp performed or would have performed its obligations under the contract; and (3) McCorhill failed to perform under the contract through no fault of Enercomp. See, e.g., Nordic Bank PLC v. Trend Group, Ltd., 619 F.Supp. 542, 561 (S.D.N.Y.1985); Republic Corp. v. Procedyne Corp., 401 F.Supp. 1061, 1068 (S.D.N.Y.1975). A valid contract was, of course, a necessary element of the tortious interference claim. S & S Hotel Ventures Ltd. Partnership v. 777 S.H. Corp., 108 A.D.2d 351, 354, 489 N.Y.S.2d 478, 480 (1st Dep't 1985).
 
 
 30
 As to the second element of breach of contract, the trial court properly charged the jury that Enercomp had to prove its ability to perform the agreement in order to recover damages. It specifically advised that McCorhill's defense was premised, at least in part, on the contention that Enercomp could not perform because it had substantial undisclosed liabilities. Mindful that proof having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," Fed.R.Evid. 401, we conclude that evidence of a possible undisclosed $70,000 obligation from Enercomp to the Summit Trust Company was relevant to proving plaintiffs' ability to perform that portion of the agreement calling for it to have no substantial undisclosed liabilities. Accordingly, we consider the complained-of limitations on proof and argument.
 
 
 31
 McCorhill first raised the issue of undisclosed liabilities in its opening statement, telling the jury that Enercomp "makes an affirmative representation that there are no substantial undisclosed liabilities, which we've later found and you will see is a falsehood." During the cross-examination of Stephen Flaks the matter was more directly pursued. Defendants offered and the court received in evidence a copy of a May 14, 1984 UCC-1 filing by the Summit Trust Company reflecting the fact--but not the amount--of an Enercomp guarantee secured by all of the company's equipment, inventory or accounts receivable, whether now existing or subsequently acquired. Flaks acknowledged learning--but only during pretrial discovery--that Eugene G. Walker, former president of Enercomp, had signed this guarantee obligating Enercomp for a debt of Metropolitan Compactors to the Summit Trust Company. He did not, however, think this obligation was binding because he questioned Walker's authority to sign such a guarantee. Moreover, although he did not know the precise amount of the obligation, he did not think it represented a large liability. He did admit that, if it were $70,000, Enercomp could not have satisfied the obligation from its cash balance at the time of the merger negotiations.
 
 
 32
 McCorhill subsequently sought to call a witness from the Summit Trust Company to testify to the principal amounts of the obligation guaranteed by Enercomp at various times when the merger was contemplated. Plaintiffs objected to receipt of such evidence as irrelevant and collateral since: (1) McCorhill conceded it had not relied on the $70,000 guarantee in terminating its relationship with Enercomp; (2) the existence of liens had been disclosed to McCorhill in statements filed on behalf of Enercomp and Metropolitan Compactors with the Securities and Exchange Commission; and (3) plaintiffs disputed Walker's authority to sign the guarantee.
 
 
 33
 The first argument fails to consider plaintiffs' own burden to prove their ability to merge without substantial undisclosed liabilities. See generally Penthouse Int'l, Ltd. v. Dominion Federal Sav. & Loan Ass'n, 855 F.2d 963, 979 (2d Cir.1988) (quoting 4 A. Corbin, Corbin on Contracts Sec. 978, at 924-25 (1951): "In an action for breach by an unconditional repudiation it is still a condition precedent to the plaintiff's right to a judgment for damages that he should have the ability to perform all such conditions. If he could not or would not have performed the substantial equivalent for which the defendant's performance was agreed to be exchanged, he is given no remedy in damages for the defendant's non-performance or repudiation."). The second overlooks Flaks' testimony that he himself had not known of the Summit Trust lien, despite his presumed familiarity with his company's SEC filings. The third is a factual issue that could not be addressed absent proof. Nevertheless, the trial court sustained the objection, finding that the evidence proffered was "collateral" and would "extend the trial."
 
 
 34
 When the same issue arose during the testimony of Eugene Walker, McCorhill's counsel advised the district court that inquiry into the Summit Trust lien was "crucial to our defense ... that Enercomp could not perform." Plaintiffs again raised a relevancy objection, pointing to McCorhill's lack of reliance on the lien in terminating the merger. The district court properly noted that the evidence was not offered "on the question of reliance," but ultimately concluded that the inquiry was relevant only to a fraud counterclaim and accordingly limited McCorhill's questioning of Walker to: (1) whether he had signed the guarantees--which he acknowledged he had; and (2) whether he had discussed them with Flaks--which he stated he had not. In light of the latter response, the court sustained objection to receipt of the guarantees in evidence. It did, however, allow counsel to elicit from Walker the fact that the amount guaranteed was $70,000.
 
 
 35
 McCorhill's final attempt to offer evidence pertaining to the Summit Trust liens arose in the course of its examination of Robert Aitkens, a senior accountant with Enercomp's auditors. McCorhill proffered that Aitkens would acknowledge that in a financial statement prepared for the merger--the only one reporting Enercomp's status separate and apart from that of Metropolitan Compactors--the auditors inadvertently omitted the $70,000 Summit Trust lien. Plaintiffs objected, once again erroneously arguing the irrelevancy of facts learned after the parties' relationship was terminated. They further contended that introduction of evidence about the Summit Trust lien would require them to prove that Walker lacked authority to sign the guarantee and that the obligation had, in any event, been substantially paid. The district court continued to view the issue as collateral and sustained objection.
 
 
 36
 During summation, counsel for McCorhill argued that although Enercomp represented in the merger agreement that "there are no substantial undisclosed liabilities," the proof at trial was to the contrary. In support of this argument, he referred to "[d]efendants' Exhibit S in evidence ... a UCC filing in Albany by the Summit Trust Company, which shows that all of Enercomp's--," but was immediately interrupted by an objection that the reference was "beyond the scope." The court advised McCorhill "to go on to something else." When counsel sought leave to argue Walker's admission to signing the guarantee, he was once again told by the court "to move on to something else."
 
 
 37
 Plaintiffs' counsel, in responding to the contention that substantial liabilities had been undisclosed, characterized the defense as "sheer nonsense." When he then sought to address "the only liability that you heard about in the ten days that this trial has taken so far--," McCorhill's counsel objected that "[i]f I was foreclosed in going into that area, it applies to Mr. Levin as well." The court overruled the objection, permitting counsel to defend the outstanding printing bill as the only undisclosed liability.
 
 
 38
 We think virtually all of the proffered evidence relating to the Summit Trust lien was probative and should have been received. We note, however, that had defendants been free to argue, from such evidence as was actually received with respect to the $70,000 guarantee, that this obligation cast doubt on Enercomp's ability to perform according to the terms of the merger agreement, we would not be inclined to reverse the judgment simply on the basis of evidentiary rulings with which we disagree. Under such circumstances, defendants' counsel could have pulled together (1) Flak's admission that there was an obligation to Summit Trust with (2) Walker's testimony that it was in the amount of $70,000 and (3) the UCC filing showing that it encumbered all present and future assets of Enercomp. Although this might have left some question as to whether the obligation was indeed in effect at the time the merger was contemplated, and while it would not have established omission of the obligation from the last audit of Enercomp conducted in anticipation of the merger, vigorous argument might nevertheless have avoided undue prejudice to the defendants.
 
 
 39
 Without argument, however, we think it was impossible for the jury to pull together the relevant evidentiary bits and pieces from the mass of other evidence before it, or clearly to understand that it was this guarantee--and not simply the outstanding printer's bill--that defendants relied on as proof that Enercomp could not have complied with the financial expectations of the merger agreement. The net effect of the evidentiary rulings and the limitation imposed on summation deprived defendants of a key challenge to an element of the case on which plaintiffs bore the burden of proof. The importance to the factfinding process of allowing each side in an adversary proceeding to marshal the evidence for its position before the case is submitted to the jury is well recognized. See Herring v. New York, 422 U.S. 853, 862-63, 95 S.Ct. 2550, 2555-56, 45 L.Ed.2d 593 (1975) (overturning New York statute granting judge in non-jury criminal trial discretion to deny opportunity for summations). Particularly where, as in this case, the party with the burden of proof was allowed to argue that the only evidence of a substantial liability was the printer's bill, the limitation on McCorhill's ability to refer in its summation to the Summit Trust lien impermissibly deprived it of the opportunity "to set the record straight." Cf. Hydrolevel Corp. v. American Society of Mechanical Engineers, Inc., 635 F.2d 118, 128 (2d Cir.1980) (defendant cannot be heard to complain of prejudice from adversary's summation where it had full opportunity to reply), aff'd on other grounds, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982).
 
 
 40
 The limitations on the introduction of evidence and the preclusion of argument on a significant issue in the case thus unduly prejudiced defendants in the presentation of a key aspect of their defense and warrant reversal of the judgment and a new trial.
 
 
 41
 Although no other argument raised by appellants warrants reversal, we address each in turn.
 
 III. Pendent Jurisdiction
 
 42
 McCorhill, the McCorhill stockholders and Meridian argue that the district court improperly exercised pendent jurisdiction. They contend that the securities claim that had supported federal jurisdiction should have been dismissed before rather than during trial and, therefore, that the state claims should never have been presented to the jury. The exercise of pendent jurisdiction in a case where a proper basis for the exercise of federal jurisdiction has been raised is a matter of discretion. Appellants, however, point to language in United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) that "if ... federal claims are dismissed before trial ... state claims should be dismissed as well."
 
 
 43
 Regardless of what appellants contend should have happened to the securities claim prior to trial, the fact is that the court did not dismiss the claim until the close of plaintiffs' direct case. By that point substantial judicial resources had been invested in the case, a jury empanelled and testimony given. To require all this to be duplicated in state court would hardly have served the interests of economy, convenience and fairness that are central to any exercise of pendent jurisdiction. United Mine Workers v. Gibbs, 383 U.S. at 726, 86 S.Ct. at 1139.
 
 
 44
 We note that, even when federal claims are resolved before trial, comity does not automatically mandate dismissal of pendent state claims. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988); Rosado v. Wyman, 397 U.S. 397, 403-05, 90 S.Ct. 1207, 1213-14, 25 L.Ed.2d 442 (1970); Baylis v. Marriott Corp., 843 F.2d 658, 664-65 (2d Cir.1988). As the Seventh Circuit recently explained: "Trial is simply a convenient benchmark marking the point by which substantial resources have surely been committed. If those resources are expended without a trial, the essential purpose of the doctrine of pendent jurisdiction may be served by retaining the case." Graf v. Elgin, Joliet and Eastern Ry. Co., 790 F.2d 1341, 1348 (7th Cir.1986); see Kavit v. A.L. Stamm & Co., 491 F.2d 1176, 1180 n. 4 (2d Cir.1974); 13B C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 3567.1, at 136 n. 20 (2d ed. 1984); 3A J. Moore, J. Lucas & G. Grotheer, Moore's Federal Practice Sec. 1807[.1-3], at 18-54 n. 40 (2d ed. 1987).
 
 
 45
 In this case, as the district court aptly observed, it would have "stood judicial economy on its head" not to proceed with the state claims even if the securities action had been dismissed prior to trial. The case had involved over eleven months of often heated pretrial litigation. The district court had already issued numerous memoranda and orders. Dispositive motions were not filed until the very eve of trial. Under such circumstances, it would have been a pointless waste of judicial resources to require a state court to invest the time and effort necessary to familiarize itself with a case well-known to the presiding federal judge. It would have been unfair to the plaintiffs to transfer a case scheduled for trial within days in federal court to a state tribunal where it would have had to wait perhaps months to be heard. This court sees no inconvenience to either party from the exercise of pendent jurisdiction in this case.
 
 IV. Breach of Contract
 
 46
 Appellants urge reversal of the judgment against them for breach of contract on the grounds: (A) that there was no binding contract between the parties; (B) that repudiation or rescission was justified because (1) Enercomp failed to comply with a condition precedent, (2) performance was impossible or excused by mutual mistake, and (3) termination was authorized by a clause in the agreement; and (C) that an indemnification clause absolved the McCorhill stockholders of any liability under the contract. None of these arguments has merit.
 
 A. The Formation of the Contract
 
 47
 Appellants contend that the August 1984 merger agreement was not intended by the parties to be a binding contract. Where parties' intent cannot be conclusively determined as a matter of law from the terms of the agreement at issue, a factual question arises that must be resolved by a jury. Interocean Shipping Co. v. National Shipping & Trading Corp., 523 F.2d 527, 534 (2d Cir.1975), cert. denied, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976); Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp., 41 N.Y.2d 397, 400, 393 N.Y.S.2d 350, 352, 361 N.E.2d 999, 1002 (1977). "[T]he objective manifestations of the intent of the parties as gathered by their expressed words and deeds" are the appropriate focus of inquiry. Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp., 41 N.Y.2d at 399, 393 N.Y.S.2d at 352, 361 N.E.2d at 1002; see Winston v. Mediafare Entertainment Corp., 777 F.2d 78, 80 (2d Cir.1985). When such factors demonstrate at best an "agreement to agree," leaving open for future negotiations essential terms of the parties' relationship, no enforceable contract is created. See, e.g., Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 249, 417 N.E.2d 541, 543 (1981). But the mere fact that some terms may be left open does not automatically render an agreement unenforceable. " 'Many a gap in terms can be filled, and should be [filled],' " where it is clear that the parties intended to form a contract and " 'to bind themselves to render a future performance.' " Lee v. Joseph E. Seagram & Sons, Inc., 552 F.2d 447, 453 (2d Cir.1977) (quoting 1 A. Corbin, Corbin on Contracts Sec. 97, at 425-26).
 
 
 48
 In this case, appellants contend that the 1984 merger agreement was not a binding contract because: (1) the possibility existed for some other exchange of stock than that provided in the agreement; (2) the parties had failed to attach financial statements as provided in the agreement, and (3) no definite closing date was stated. A jury looking at the overall intent of the contracting parties was, nevertheless, justified in concluding that a binding agreement had been reached.
 
 
 49
 With respect to the exchange of shares, the agreement does provide for the McCorhill stockholders to gain control of Enercomp through the exchange of 5,896,224 Enercomp shares for all of McCorhill's. This number was supposed to represent 51% of Enercomp's total shares after outstanding warrants were redeemed and Freedman awarded stock for his efforts in bringing the parties together. Because the parties could not foresee what effect the announcement of their merger would have on the market for Enercomp stock and, therefore, could not predict the exact number of warrants that would be redeemed, it was possible that some adjustment in the number of shares exchanged would be made.
 
 
 50
 We are, nevertheless, satisfied that the parties' intentions in this regard are sufficiently clear from the agreement. However many warrants were ultimately redeemed and shares ultimately exchanged, the McCorhill stockholders would, in the end, hold at least 51% of Enercomp's total outstanding shares. Greater precision was not required to form a binding contract. So long as a contract provides some degree of certainty as to price, the fact that the final calculation will depend on a subsequent extrinsic event does not render the agreement unenforceable. See Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 52 N.Y.2d at 110, 436 N.Y.S.2d at 249-50, 417 N.E.2d at 543-44.
 
 
 51
 Although the parties did not attach the specified financial statements to the agreement, it is clear that they were willing to sign the document without seeing these accounts. Certainly, financial documents are not necessary to an understanding of any clause in the agreement. Moreover, the reason Enercomp did not provide a balance sheet is easily explained: it had not yet concluded its relationship with Metropolitan Compactors and all financial statements then existing reported the two companies' assets and liabilities jointly.
 
 
 52
 Although entering into a merger agreement without exchanging and reviewing financial statements may appear to be unwise--and, indeed, calls to mind the maxim that those who marry in haste are often left to repent at leisure--the contract nevertheless demonstrates that the parties knew how to protect themselves from rude financial surprises. Enercomp conditioned its contractual obligations on expert approval of McCorhill and Kraus Thomson's business condition. McCorhill failed to do likewise. Perhaps McCorhill was initially more concerned with securing a $250,000 loan from Enercomp shareholders than with reviewing Enercomp's balance sheet. Certainly the jury was entitled to conclude as much. Moreover, the agreement does impose immediate obligations on the parties with respect to their stock and capital expenditures that further supports an intent to contract. Under all these circumstances, we cannot say that the failure to attach the financial documents called for in the merger agreement mandates a legal finding that the parties did not enter into a binding contract.
 
 
 53
 Similarly, the lack of a final closing date does not render a contract unenforceable. American Cyanamid Co. v. Elizabeth Arden Sales Corp., 331 F.Supp. 597, 604 (S.D.N.Y.1971); see also Schmidt v. McKay, 555 F.2d 30, 35 (2d Cir.1977) (reasonable time for performance should be assumed when contract is not specific). In this case, there could be no final merger of Enercomp and McCorhill until the latter acquired Kraus Thomson. Since this transaction was not fully realized at the time the parties signed the 1984 merger agreement, it is easy to understand why a final merger date was not specified.
 
 B. Repudiation or Rescission
 1. Condition Precedent
 
 54
 Appellants argue that they were justified in repudiating the 1984 merger agreement because Enercomp failed to comply with the condition precedent that it be a "clean shell" with no liabilities and $20,000 in assets. Whether or not this was a condition precedent was in sharp factual dispute.
 
 
 55
 Indeed, the 1984 agreement says nothing about Enercomp having no liabilities, much less $20,000 in assets. The only written support that can be found for the latter demand is in the provision of the agreement that each of the parties "bear its own direct and indirect expenses incurred in connection with the negotiation and preparation of this agreement and the consummation and performance of the transactions contemplated hereby." But as to liabilities, the agreement requires only that Enercomp not have any substantial liabilities not disclosed on its balance sheet. Because there never was a balance sheet attached to the agreement, it is unclear what the parties understood or expected the financial condition of Enercomp would be.
 
 
 56
 Appellants did adduce both testimonial and documentary evidence that, in the months after the signing of the 1984 agreement, Gerald Cahill repeatedly demanded that Enercomp have no liabilities prior to merger and, in fact, have $20,000 in assets to cover attorneys' fees. Stephen Flaks admitted that in most mergers a "clean shell" is desired, and that he did endeavor to resolve an outstanding Enercomp printer's bill called to his attention by appellants prior to closing, but he denied that there was any agreement that Enercomp have no liabilities prior to closing.
 
 
 57
 In this context, whether the presentation of Enercomp as a "clean shell" with $20,000 in assets was an agreed-upon condition precedent to merger was a question of fact for the jury that turned, in large part, on an assessment of the witnesses' credibility. See American Home Assurance Co. v. Baltimore Gas & Elec. Co., 845 F.2d 48, 50-51 (2d Cir.1988); Krofft Entertainment, Inc. v. CBS Songs, 653 F.Supp. 1530, 1533 (S.D.N.Y.1987).
 
 2. Impossibility and Mutual Mistake
 
 58
 Appellants argue that several misrepresentations by Enercomp in the 1984 agreement would have justified McCorhill's rescission for impossibility of performance, for example, Enercomp's statements that it was empowered under its corporate charter to issue the shares needed to effect the merger, that no shareholder action was necessary to complete the merger, and that all necessary filings had been made with appropriate regulatory agencies. Similarly, they argue that because both sides were unaware of the $70,000 Summit Trust lien on Enercomp's assets when they signed the 1984 agreement, McCorhill could repudiate based on mutual mistake.
 
 
 59
 The evidence at trial, however, was that appellants did not, in fact, rely on any of these factors in terminating their relationship with Enercomp. Thus, the case was not presented to the jury on the theories here advanced. We think the arguments are more properly considered in light of Enercomp's burden to prove the ability to perform its obligations under the contract.
 
 
 60
 As discussed more fully in Point II, supra, to the extent relevant evidence and argument was excluded with respect to the $70,000 Summit Trust lien, we reverse. As to the alleged misrepresentations, however, it was for the jury to decide whether the parties could reasonably have been expected to resolve these matters prior to closing. See Kleinschmidt Div. of SCM Corp. v. Futuronics Corp., 41 N.Y.2d 972, 973, 395 N.Y.S.2d 151, 152, 363 N.E.2d 701, 702 (1977). We cannot say that the only reasonable conclusion to be reached from the evidence was that it would have been impossible for Enercomp to meet these obligations prior to merger. Accordingly, we decline to disturb the judgment on this ground.
 
 3. Termination Clause
 
 61
 Pursuant to paragraph 10 of the merger agreement, "[t]he Parties reserve the right to modify, amend or terminate this Agreement without the consent of any person." Appellants contend that this clause gave either side the right to terminate the agreement for any reason without risk of liability. In opposing judgment notwithstanding the verdict, Enercomp argued that the clause reserved to the parties the right jointly to terminate the agreement without the consent of third parties.
 
 
 62
 The district court found the latter construction "utterly implausible," given that no third party had a legal right to impose its will on the contracting parties. Nevertheless, it did not find the clause as unambiguous as appellants urge, particularly in light of the parties' failure to state therein when and under what conditions the right to terminate would be subsumed by the binding commitment. As the district court specifically noted, Enercomp shareholders did lend McCorhill $250,000, conduct that hardly seems consistent with an understanding that McCorhill could terminate the merger agreement at any time and for any reason.
 
 
 63
 While we recognize that a contract should not be interpreted so as to leave any clause expressly included by the parties without effect or purpose, Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir.1985), neither should a clause be interpreted in such a way as to make it absurd, see Newmont Mines, Ltd. v. Hanover Ins. Co., 784 F.2d 127, 135 (2d Cir.1986). Appellants' proposed interpretation presents precisely such a risk, for it would mean not only that the parties could terminate at will, but also that they each could modify or amend at will. Where contractual language unambiguously states the parties' intent such that reasonable persons could not differ on this issue, it is appropriate for the contract to be interpreted by the court as a matter of law. See, e.g., American Home Assurance Co. v. Baltimore Gas & Elec. Co., 845 F.2d at 50-51; Wards Co. v. Stamford Ridgeway Assocs., 761 F.2d 117, 120 (2d Cir.1985); American Home Products Corp. v. Liberty Mutual Ins. Co., 748 F.2d 760, 765 (2d Cir.1984). This, however, is not such a case.
 
 C. Indemnification Clause
 
 64
 Paragraph 10 of the merger agreement states:
 
 
 65
 The Stockholders agree to indemnify, defend and hold harmless Enercomp, and Enercomp agrees to indemnify, defend and hold harmless the Stockholders, from and against any and all liability ... arising out of, due to or otherwise in respect of any inaccuracy in or breach of any of their respective representations, warranties, covenants or agreements contained in this Agreement or in any document, instrument, certificate or agreement delivered thereby pursuant thereto.
 
 
 66
 The McCorhill stockholders contend that, as a matter of law, the plain language of this section requires reversal of the judgment against them for breach of contract. The construction urged, however, is somewhat at odds with the agreement as a whole. See Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d at 1019; Weiss v. Weiss, 52 N.Y.2d 170, 174, 436 N.Y.S.2d 862, 864, 418 N.E.2d 377, 379, (1981). As the district court noted, it would mean that, even if all other obligations were satisfied, the McCorhill stockholders could, in the end, simply refuse to surrender their shares for the merger without any risk of liability.
 
 
 67
 It is further noteworthy that the indemnification clause is reciprocal, suggesting that the McCorhill stockholders could not sue Enercomp for any breach of the agreement as well as the converse urged here. At oral argument, counsel for the stockholders seemed surprised when we noted this fact and was unable to explain its meaning. The district court thought that what the parties may have intended was to indemnify each other from any liability incurred after merger. While this has logical appeal, the parties certainly did not state it with any precision. As with other parts of the agreement then, the indemnification clause is simply not susceptible to interpretation as a matter of law. Its meaning is properly left to jury resolution. See American Home Assurance Co. v. Baltimore Gas & Elec. Co., 845 F.2d at 50-51; State v. Home Indemnity Co., 66 N.Y.2d 669, 671, 495 N.Y.S.2d 969, 971, 486 N.E.2d 827, 829, (1985); Sutton v. East River Sav. Bank, 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462, 435 N.E.2d 1075, 1077 (1982).
 
 V. Jury Instructions and Interrogatories
 
 68
 Appellants' challenges to the correctness and completeness of various jury instructions and to the interrogatories posed to the jury are deemed waived for failure to make a timely objection pursuant to Fed.R.Civ.P. 51. Air et Chaleur, S.A. v. Janeway, 757 F.2d 489, 493-94 (2d Cir.1985).
 
 
 69
 In any event, we find no error in the instructions actually given by the district court, although on retrial further instruction and specific interrogatories on certain aspects relevant to the case may be useful. For example, the court may wish to advise the jury on the significance of the termination and indemnification clauses to the case and the principles that should be followed in interpreting them. It may also be appropriate to ask the jury not simply whether they think a binding contract was formed between the parties but whether Enercomp proved its ability to perform its responsibilities thereunder. The parties will, of course, be free to submit to the district court proposed instructions on these and any other relevant areas.
 
 VI. Damages
 A. Expert Testimony on Damages
 
 70
 Appellants' challenge to the receipt of expert testimony from a Senior Associate in Corporate Finance at Prudential Bache Securities on the value of McCorhill's assets is without merit. Rule 702 of the Federal Rules of Evidence specifically provides for the receipt of expert testimony whenever it can "assist the trier of fact to understand the evidence or to determine a fact in issue." A district court enjoys broad discretion in determining when an expert's opinion can be of such assistance and its decision "is to be sustained on appeal unless it is shown to be 'manifestly erroneous.' " United States v. Daly, 842 F.2d 1380, 1387 (2d Cir.) (quoting Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962)), cert. denied, --- U.S. ----, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988).
 
 
 71
 The record indicates that the expert witness in this case had considerable experience in the field of mergers and acquisitions and was qualified to evaluate the McCorhill assets. To the extent he may have departed from general valuation practices in this case or adopted procedures subject to criticism, appellants had ample opportunity to elicit these facts and argue them to the jury. It was then for the jury to decide, based on the expert's training, background and procedures, whether to accept his opinion and what weight to assign to it. See Moe v. Avions Marcel Dassault-Breguet Aviation, 727 F.2d 917, 929-30 (10th Cir.), cert. denied, 469 U.S. 853, 105 S.Ct. 176, 83 L.Ed.2d 110 (1984).
 
 B. Measure of Damages
 
 72
 Similarly meritless is appellants' challenge to the standard applied to calculate damages. Plaintiffs are entitled to receive the benefit of the bargain they made, i.e., "the amount necessary to put [them] in the same economic position [they] would have been in had the defendant[s] fulfilled [the] contract." Adams v. Lindblad Travel, Inc., 730 F.2d 89, 92 (2d Cir.1984). Nothing in the facts or law supports appellants' argument that plaintiffs were obligated to accept specific performance.
 
 Conclusion
 
 73
 Since the evidence was insufficient to support the tortious interference claim, we reverse the judgment to the extent that it imposes liability on Freedman and Meridian and remand with directions to dismiss this claim. The limitations on the introduction of evidence and argument pertaining to the Summit Trust lien unduly prejudiced the remaining appellants on the issue of whether Enercomp could prove ability to perform the contract and, therefore, require reversal and remand for a new trial on the breach of contract claim. We otherwise find no merit in the arguments raised by appellants.
 
 
 74
 Reversed and remanded.
 
 
 
 *
 Honorable Reena Raggi, United States District Court for the Eastern District of New York, sitting by designation