**Reginald V. SCHMIDT,**
**Plaintiff-Appellant,**

v.

**Raymond T. McKAY and John F. Brady, representatives of a class of persons who were members of District 2—Marine Engineers Beneficial Association—AFL-CIO in September 1971, Defendants-Appellees.**

No. 511, Docket 76–7422.

United States Court of Appeals, Second Circuit.

Argued March 3, 1977.
Decided May 12, 1977.

John H. Doyle, III, New York City (Anderson, Russell, Kill & Olick, P. C., New York City, on the brief), for plaintiff-appellant.

Joel C. Glanstein, New York City (Markowitz & Glanstein, New York City, on the brief), for defendants-appellees.

Before LUMBARD and OAKES, Circuit Judges, and BRYAN, District Judge.*

LUMBARD, Circuit Judge:

In this diversity action, Reginald V. Schmidt, a citizen of Florida, appeals from an order of the Eastern District, Bruchhausen, Judge, entered on August 9, 1976, dismissing his second amended complaint on the ground that the claims alleged therein are time-barred under the applicable New York statute of limitations, CPLR § 213. Defendants-appellees Raymond T. McKay and John F. Brady, the president and secretary-treasurer respectively of District 2, Marine Engineers Beneficial Association— AFL–CIO (hereinafter "MEBA"), are sued in their representative capacities on behalf of a class consisting of all persons who were members of MEBA in September 1971, pursuant to Fed.R.Civ.Pro. 23.1.[1]  MEBA is an

---

\* Sitting by designation.

1. This action was initiated on November 27, 1972 against McKay and Brady individually

unincorporated association with headquarters in Brooklyn. Schmidt alleges (1) that appellees breached a contractual obligation to negotiate an agreement with the trustees of the MEBA pension plan under which he would be provided with credits for past service, or, in the alternative, to make appropriate contributions in his behalf so that he would receive pension credits for past service; (2) that appellees' promises should be enforced under the doctrine of promissory estoppel; and (3) that McKay and Brady, acting in their representative capacity, committed fraud in making the foregoing promises with no intent to attempt their fulfillment and with the intent to cause him to rely on these misrepresentations to his detriment. On appellees' motion for summary judgment, the district court held that appellant had filed his action eleven days beyond the applicable six-year statute of limitations. We hold that the statute of limitations had not run on Schmidt's contract and promissory estoppel claims and that the court erred in granting summary judgment dismissing appellant's fraud claim; accordingly, the order of the district court is reversed.

Schmidt alleges that from about May 15, 1948 until 1972, he was a member in good standing of MEBA, and was employed as an engineer by Cities Service Tanker Corporation from 1946 until 1966, during which time Cities Service did not have a collective bargaining agreement with MEBA.

Schmidt claims that in May, 1966 MEBA was engaged in an intensive effort to organize the engineers employed by Cities Service and that prior to May 12, 1966 two representative elections had been held, both resulting in tie votes. According to Schmidt, around May 12, 1966 McKay and Brady sought his help and McKay orally promised him that, regardless of whether the campaign against Cities Service was successful, in return for his support in the campaign they would ensure that he was included in the MEBA pension plan with full benefits upon his retirement.

According to the affidavit of Thomas J. Mackell, Jr., the administrator of the MEBA pension plan, the plan is a jointly administered Taft-Hartley trust. Pension credits are earned by MEBA members through service as licensed marine engineer officers on oceangoing vessels under contract with MEBA. In order to qualify for a normal pension, 20 years credited service is required; benefits of greater value may be acquired through continued work in the industry beyond 20 years.

Schmidt alleges that on May 12, 1966 McKay sent a letter to him aboard the SS Council Grove; apparently, similar letters were sent to the other engineers aboard the Council Grove. The letter advised that Cities Service was about to violate an election agreement with MEBA by negotiating with a competing union. It explained that under the terms of the MEBA plan, the past service credits of engineers employed by "newly participating companies" could be picked up after the company had paid one year's contribution into the plan and that this would be done for engineers in the Cities Service fleet if Cities Service became a party to the plan. The letter then stated that action had been taken against Cities Service's breach of the election agreement and that MEBA made the "following additional commitment to all the Engineers employed by the Cities Service Tanker Corp.:

A) District 2 MEBA will satisfactorily conclude with the Trustees of the District 2 MEBA Pension Plan an agreement permitting the Plan to pick up all the past service credits of any Engineer who supports District 2 MEBA in its current ac-

and as representatives of MEBA. Appellant's original complaint, which contained no class allegations, was dismissed by the district court for lack of subject matter jurisdiction due to lack of complete diversity on May 16, 1973. By an order filed February 6, 1974, this court vacated the judgment of the district court and remanded with leave to amend the complaint.

*Schmidt v. McKay,* No. 73–2047 (2d Cir. Feb. 6, 1974). Schmidt amended his complaint to include class allegations and by order entered August 11, 1975, the district court certified the defendant class and dismissed the individual claims against McKay and Brady. No appeal has been taken from this order.

tion against the violation of the election agreements—regardless of how this action comes out.

B) District 2 MEBA further guarantees that in the unlikely event that A) above is not accomplished by the Trustees' action, District 2 MEBA will make the appropriate contributions in behalf of said Engineers supporting District 2 MEBA in this action, with the result that the past service credits of the Engineers supporting District 2 MEBA will be totally accredited to their accounts for pensions from the District 2 MEBA Pension Plan."

The letter on MEBA stationery was signed, "Raymond T. McKay, President."

On May 26, 1966 a second letter, also on MEBA stationery and signed by McKay and Brady, was sent to all Cities Service engineers. This letter enclosed the May 12 letter and stated that Cities Service had "reconsidered" its position and had agreed to another representation election. The letter warned, however, that action against the company might still be necessary and stated that "[s]hould the Company refuse to agree to fair election conditions and permit the elections to progress without prejudicial interference, we will then institute our original plan." The letter advised that should such action become necessary, "then the terms, commitments and conditions for the Council Grove Engineers will apply to *all* Cities Service Engineers." (emphasis in original).

Apparently, MEBA later concluded that action against the company was necessary and Schmidt took over direction of a picket line around the SS Bradford Island, a Cities Service vessel docked at Mobile, Alabama. Schmidt took part in the strike action from October 26, 1966 to November 16, 1966, when it appears the picket line was terminated because the engineers and mates

aboard the Bradford Island were successfully organized. Schmidt claims that his support of MEBA on this occasion was taken in reliance upon McKay's oral promise and the letters of May 12 and 26. Although the Bradford Island battle was won, the union lost the war and MEBA never became the collective bargaining representative for the Cities Service engineers.[2]

Schmidt alleges that because of his union activity he was demoted by Cities Service and resigned. He then found employment for the next four years (from 1967 to 1971) with companies under contract with MEBA. On September 22, 1967 he wrote to Brady stating that he had heard rumors that the union had refused to pick up his time with Cities Service and he "told them this was all a big lie." He then stated, "I wonder if it would do any good to . . . have the union certify my time for retirement . . . ." The Mackell affidavit explains that under the MEBA pension plan, employees "are entitled to periodically request from the Plan certification . . . of their earned pension credits." Certification enables the individual to establish the amount of pension credits earned under the plan and thereby determine whether he has qualified for a pension or for increased benefits. In his deposition, Schmidt testified that prior to May, 1966 he was aware that in order to earn pension credits it was necessary to be employed by a company under contract with MEBA. Schmidt never received an answer to his letter of September 22 and did not request certification of his credits prior to his application for a pension. In his deposition Schmidt also stated that he believed a binding contract had been established when he engaged in the strike action at the Bradford Island dock. Brady indicated in his deposition that although he assumed that something could be worked out to make good the commitments referred

---

2. Although it appears that a third election was held during 1966 and that MEBA lost, the record does not make clear when this election was held. See note 4, infra. Thus, it is not clear whether the strike action at the Bradford Island in October and November 1966 involved a dispute over the election or a subsequent organizational effort. Whether appellees' alleged promises were limited to organizational activity related to the election or, as appellant apparently contends, extended to any efforts in support of the organizational campaign against Cities Service is a question of contract interpretation upon which we express no opinion.

to in the letters of May 12 and 26, no efforts were made to carry them out because appellant was the first to raise the issue. McKay testified along similar lines in his deposition.

In February, 1971 Schmidt sought to retire and submitted an application to participate in the MEBA pension plan. Around September 1, 1971 Schmidt was notified by the claims coordinator of the plan that he was ineligible for a pension; the Mackell affidavit explains that the ground for the denial was that Schmidt had worked for a covered employer for only four years (1967–1971) and had not accumulated sufficient credits to qualify.

On November 27, 1972 Schmidt filed this action in district court. His complaint stated three claims—that appellees had breached their contract with him, that they were bound by the doctrine of promissory estoppel, and that they had committed fraud, as described, supra.[3] After an extended jurisdictional dispute, see note 1, supra, appellees made a motion on November 21, 1975 seeking, *inter alia,* summary judgment on the grounds that Schmidt's claims were barred by the statute of limitations.

Judge Bruchhausen held that all three claims were time-barred. He found that the six-year New York statute of limitations applied to all three claims and had begun to run on all three claims on November 16, 1966. See CPLR § 213. Turning first to the contract claim, the court found that as of November 16, 1966, the date the Bradford Island strike action successfully terminated, "plaintiff had every right to attempt enforcement of defendants alleged promises" and was obligated "to seek a certification from the pension plan which would have informed the plaintiff of his credits, and then be able to sue for credits for past service if denied by virtue of the alleged promises of defendants." The court then stated that appellant's second claim, founded upon the doctrine of promissory

estoppel, was "also subject to the six-year statute of limitations, commencing November 16, 1966." Finally, with respect to appellant's fraud claim, the court concluded that, "the facts presented clearly indicate that fraud, if any, could have been discovered with reasonable diligence commencing November 16, 1966." Accordingly, since appellant's complaint had not been filed until November 27, 1972 (six years and eleven days subsequent to November 16, 1966) his claims were held time-barred.

█ Turning first to appellant's contract claim, the parties agree that the New York statute of limitations governs appellant's state law claims. See *Ragan v. Merchants Transfer and Warehouse Co.,* 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520 (1949); *Guaranty Trust Co. v. York,* 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Witherow v. Firestone Tire & Rubber Co.,* 530 F.2d 160, 165 (3rd Cir. 1976). CPLR § 213(2) provides in relevant part that "an action upon a contractual obligation or liability express or implied," must be commenced within six years. In New York as elsewhere, the general rule is that the statute of limitations begins to run on the date that a cause of action for breach accrues, which is ordinarily the time of the breach of the agreement. See, e. g., *Crump v. Christy,* 28 A.D.2d 1179, 1180, 284 N.Y.S.2d 472 (3d Dep't 1967); *Smith v. McLaughlin,* 251 App. Div. 727, 295 N.Y.S. 593 (2d Dep't 1937); 2 Carmody-Wait 2d, § 13:154. The district court found (and this finding is not disputed by the parties) that Schmidt's right to enforce the alleged contract arose on November 16, 1966, the date that the strike action against the Bradford Island successfully terminated. In effect, appellant argues that he accepted appellees' "offer," as expressed in the letters of May 12, and 26, by engaging in the strike action and satisfactorily completing his performance on November 16.

3. Apparently, as a result of an agreement reached between MEBA and a successor to Cities Service, the trustees were able to reconsider Schmidt's application and granted him a pension retroactive to January 1, 1976. Ac-

cordingly, the parties have stipulated that the damages sought by Schmidt amount to $24,-672.04, representing pension benefits claimed due for the period March 1, 1971 through December 31, 1975.

The district court appears to have held that if an enforceable contract did arise on November 16, 1966, it was breached by appellees that same day and the statute of limitations commenced to run. Appellant argues, however, that under New York law where, as here, a contract calls for a party to take action other than the simple payment of money and no time for performance is specified, then a reasonable time for performance will be implied before the promisor will be deemed in breach; further, appellant contends that a "reasonable time" for the performance of appellees' contractual obligations was not on November 16, 1966 or as soon as eleven days thereafter and, thus, the statute of limitations had not run when his complaint was filed. We agree.

The May 12 letter indicated that those engineers aboard the Council Grove who aided MEBA in its campaign against Cities Service's breach of the election agreement would receive the following commitments: (1) MEBA would seek to gain the trustees' approval of an agreement permitting the engineers' past service credits to be picked up; and, (2) in the "unlikely event" that this could not be accomplished, MEBA would make the appropriate contributions to the pension plan to ensure that the past service credits would be picked up. The May 26 letter indicated that action against Cities Service's breach of the election agreement was no longer necessary but that further action against the company might still be required and, in that event, the "commitments and conditions" of the May 12 letter would apply to all Cities Service engineers. Assuming that Schmidt's actions during Oc-

tober-November, 1966 were sufficient to create an enforceable contract, under the terms of the May 12 letter MEBA would then come under an obligation to make a good faith effort to negotiate with the trustees to gain their approval of an arrangement permitting Schmidt's past service credits to be picked up, cf. *Van Gemert v. Boeing Co.,* 553 F.2d 812, at 815 (2d Cir. 1977) ("every contract contains the implied requirement of good faith and fair dealing"); it was only in the "unlikely event" that the trustees' approval could not be obtained that MEBA would be obligated to make direct monetary contributions to the pension plan.[4]

Since the alleged contract did not specify a time for MEBA's performance, under New York law appellees were entitled to a reasonable time in which to attempt to reach an agreement with the trustees. See *City of New York v. N. Y. Central R. R. Co.,* 275 N.Y. 287, 292–93, 9 N.E.2d 931 (1937); *Schochet v. Public National Bank,* 220 App.Div. 201, 203–04, 221 N.Y.S. 154 (1st Dep't 1927); *Bykowsky v. Public National Bank,* 209 App.Div. 61, 63, 204 N.Y.S. 385 (1st Dep't 1924), aff'd, 240 N.Y. 555, 148 N.E. 702 (1925); *Brockhurst v. Ryan,* 2 Misc.2d 747, 751, 146 N.Y.S.2d 386 (Sup.Ct.N.Y. County 1955). Thus, had Schmidt gone to court on November 16, 1966 and attempted to enforce the alleged contract, as the district court suggested, he would have been told that MEBA had a reasonable time in which to conclude negotiations with the trustees before any breach of contract could be claimed. Under the circumstances, it is enough to say that a reasonable time to attempt to conclude

4. Schmidt argues that MEBA's promises to seek an agreement with the trustees or to make direct contributions to the pension plan were themselves conditioned upon MEBA losing the election; theoretically, had MEBA won the election these commitments would have been unnecessary because, as the May 12 letter stated, the past service credits of all of the Cities Service engineers would have been picked up after Cities Service had made one year's contributions to the pension plan. Thus, Schmidt argues that since the record does not disclose whether the organizational effort against Cities Service was unsuccessful, the district court could not have found that MEBA's obligations under the alleged contract had matured. In his deposition Brady stated that the third election was held in 1966 and that the union lost by three votes. However, Brady stated that he could not accurately recall the time of the year the election was held, although "for some reason" he thought it was in the spring. For the sake of argument, we have assumed, as appellees contend, that the election was held prior to November 16, 1966, and, thus, that the alleged condition precedent to appellees' obligation to seek an agreement with the trustees had been fulfilled.

what both sides seem to agree was a rather unusual arrangement was not on the day appellees' obligation first arose, November 16, 1966, or eleven days thereafter. See, e. g., *Brockhurst v. Ryan,* supra, 2 Misc.2d at 752–53, 146 N.Y.S.2d 386. Accordingly, we hold that the six-year statute of limitations had not run on November 27, 1972 when this action was filed.

■ Schmidt was free to bring suit on his contract claim any time after a reasonable time for appellees' performance had elapsed, regardless of whether he had attempted to certify his pension credits. Consequently, the significance of the district court's finding that he had an obligation to seek certification of his pension credits is unclear. There is nothing in the record to indicate that the certification procedure is anything other than a voluntary system by which employees may definitively ascertain the number of pension credits they have earned. Although Schmidt's failure to seek certification until he applied for a pension may be relevant to the reasonableness of his reliance on appellees' alleged promises, it did not affect the running of the statute of limitations on his contract claim.

As his second claim, Schmidt alleges that he reasonably relied on appellees' promises to his detriment and that appellees are bound under the doctrine of promissory estoppel. Although there is no express provision for a statute of limitations in promissory estoppel cases, CPLR § 213(1) provides that where no limitations period is specifically prescribed, an action must be commenced within six years.

■ Under the doctrine of promissory estoppel a promise without any agreed consideration may be enforced if there has been a substantial change of position by the promisee in reasonable reliance upon the promise. See 1A *Corbin on Contracts* § 204 (1963); 1 *Williston on Contracts* § 140 (1957); *In re Flying W. Airways, Inc.,* 341 F.Supp. 26, 74 (E.D.Pa.1972). The New York courts have indicated that where the doctrine applies, "a substitute for consideration or an exception to its ordinary requirements can be found in what is styled a 'promissory estoppel.' " *Allegheny College v. National Chautauqua County Bank,* 246 N.Y. 369, 373–74, 159 N.E. 173, 175 (1927) (Cardozo, J.). See *Matter of Lipsky,* 45 Misc.2d 320, 322, 256 N.Y.S.2d 429 (Sur.Ct. N.Y. County 1965); *Harvey v. Morgan & Co.,* 166 Misc. 455, 457, 2 N.Y.S.2d 520 (Mun.Ct. Queens 1937), rev'd on other grounds, 25 N.Y.S.2d 636 (Sup.Ct.App. Term 2d Dep't 1938), aff'd, 260 App.Div. 873, 23 N.Y.S.2d 844 (1940). Although there do not appear to be any New York cases directly on point, we hold that, as in the case of Schmidt's contract claim, since appellees had a reasonable time to perform their alleged promises before they could be deemed in breach of promise, the six-year statute of limitations had not run on Schmidt's claim of promissory estoppel. See, e. g., *Van Hook v. Southern California Waiters Alliance,* 158 Cal.App.2d 556, 323 P.2d 212, 217–221 (1958). Cf. *Scheuer v. Scheuer,* 308 N.Y. 447, 450, 126 N.E.2d 555 (1955); *Crump v. Christy,* supra, 28 A.D.2d at 1179–80, 284 N.Y.S.2d 472. Under New York law the essence of either a claim of promissory estoppel or a claim of breach of contract is a claim of damages for breach of promise.

Finally, Schmidt alleges as his third claim that appellees' promises were made with no intention to attempt their fulfillment and with the intent to cause him to rely on these misrepresentations to his detriment. CPLR § 213(8) (Supp.1976) provides that an action based on fraud must be brought within six years after the time the plaintiff "discovered the fraud, or could with reasonable diligency have discovered it." However, this language must be read in conjunction with CPLR § 203(f) (Supp.1976), which provides that where a limitations period is computed from the time when facts were discovered or could with reasonable diligence have been discovered, the action must be commenced within two years after such actual or imputed discovery or "within the period otherwise provided, computed from the time the cause of action accrued, whichever is longer." Taken together, these two sections have been interpreted to

mean that a fraud action must be commenced within six years from the commission of the fraud or two years after its alleged or imputed discovery, whichever is longer. See *Klein v. Shields & Company,* 470 F.2d 1344, 1346–47 (2d Cir. 1972); *Hoff Research & Dev. Lab., Inc. v. Phillippine National Bank,* 426 F.2d 1023, 1025–26 (2d Cir. 1970); *Rickel v. Levy,* 370 F.Supp. 751, 755 (E.D.N.Y.1974); *Rutland House Associates v. Danoff,* 37 A.D.2d 828, 325 N.Y.S.2d 273 (Sup.Ct.N.Y. County 1971); *McCabe v. Gelfand,* 57 Misc.2d 12, 14–15, 291 N.Y.S.2d 261 (Sup.Ct.Kings County 1968), vacated on other grounds, 58 Misc.2d 497, 295 N.Y.S.2d 583 (Sup.Ct.Kings County 1968).

The issue before the district court was whether Schmidt had discovered, or with reasonable diligence could have discovered, the alleged fraud at any time on or before November 27, 1970—two years prior to the date the action was filed. See, e. g., *Rutland House Associates v. Danoff,* supra; *McCabe v. Gelfand,* supra, 57 Misc.2d at 14–15, 295 N.Y.S.2d 583. In this regard, the district court held simply that Schmidt could have discovered the alleged fraud with reasonable diligence "commencing November 16, 1966."

▆ Under New York law the issue of when a plaintiff, acting with reasonable diligence, could have discovered an alleged fraud turns upon whether the plaintiff possessed knowledge of facts from which he could reasonably have inferred the fraud; although a plaintiff may not shut his eyes to facts which call for investigation, mere suspicion will not suffice as a ground for imputing knowledge of the fraud. See *Erbe v. Lincoln Rochester Trust Co.,* 3 N.Y.2d 321, 325–26, 165 N.Y.S.2d 107, 144 N.E.2d 78 (1957); *Higgins v. Crouse,* 147 N.Y. 411, 416, 42 N.E. 6 (1895). This inquiry has been described as a "mixed question of law and fact," *Erbe v. Lincoln Rochester Trust Co.,* supra, 3 N.Y.2d at 326, 165 N.Y.S.2d 111, 144 N.E.2d 80, which ordinarily should not be disposed of by summary disposition. See *Erbe v. Lincoln Rochester*

*Trust Co.,* supra, 3 N.Y.2d at 326, 165 N.Y.S.2d 107, 144 N.E.2d 78; *McCabe v. Gelfand,* supra, 57 Misc.2d at 15–16, 291 N.Y.S.2d at 264 ("the better practice is to allow the defense to stand until trial," quoting *Mahfouz v. Mahfouz,* 24 A.D.2d 988, 265 N.Y.S.2d 114 (2d Dep't 1965)). Fed.R.Civ. Pro. 56(c) provides that summary judgment shall not be granted unless the relevant papers show that "there is no genuine issue as to any material fact." Since such an inquiry necessarily involves a dispute concerning state of mind and conflicting interpretations of perceived events, summary judgment is ordinarily not a proper vehicle for the resolution of such a dispute. See *Azalea Meats, Inc. v. Muscat,* 386 F.2d 5, 10 (5th Cir. 1967); *Rickel v. Levy,* supra, 370 F.supp. at 756. Thus, appellees argue that Schmidt's deposition shows that in May, 1966 he was aware that, under the pension plan, credits had to be earned through service with a covered employer. Further, appellees argue that Schmidt's awareness of the certification procedure, evidenced in his letter of September 22, 1967, and appellees' failure to respond to that letter were sufficient to allow Schmidt to infer knowledge of the fraud. On the other hand, in his deposition Brady stated that at the time the letters of May 12 and May 26, 1966 were sent out, he believed the promises contained therein could be made good and Schmidt argues that the assurances given in these letters reinforced appellees' earlier oral promises and led him reasonably to believe that MEBA would stand behind its commitments. Further, Schmidt contends that there was nothing in appellees' conduct between 1966 and 1971 (when his pension application was rejected) that indicated they did not intend to follow through on their promises and that the circumstances surrounding his letter of September 22 could, at most, have raised a "mere suspicion" of fraud.

In granting appellees' motion for summary judgment [5] the district court was re-

---

**5.** Although the district court did not label its decision a grant of summary judgment, appellees raised their statute of limitations defense on a motion for summary judgment and it is

38

quired to resolve all genuine disputes as to material facts in Schmidt's favor and in appraising his claims, we must accept his version of the facts. *Bishop v. Wood,* 426 U.S. 341, 347, and note 11, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); Fed.R.Civ.Pro. 56(c). The parties here do not differ so much over what happened; rather, the dispute centers on the inferences to be drawn from the events. We conclude that on this record the district court erred in holding that there was no "genuine issue" as to whether Schmidt, acting with reasonable diligence, could have discovered the alleged fraud on or before November 27, 1970.

Reversed and remanded for further proceedings.

clear that the court went beyond the pleadings in reaching its decision. See Fed.R.Civ.Pro. 56(c); 10 Wright & Miller, Federal Practice and Procedure § 2713 (1973).