The HOWARD BANK, Administrator of the Estate of Thomas C. Sawyer, D.B.N.

v.

UNITED STATES of America.

Civ. A. No. 88–150.

United States District Court, D. Vermont.

Jan. 3, 1991.

As Amended Jan. 29, 1991.

**1074**

Robert B. Hemley, Dennis R. Pearson, Gravel and Shea, Burlington, Vt., for plaintiff.

Merrell B. Green, Stephen Lyons, Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## FINDINGS, CONCLUSIONS, OPINION AND ORDER

PARKER, District Judge.

Plaintiff The Howard Bank, as administrator of the Estate of Thomas C. Sawyer, filed suit seeking a refund of certain estate taxes paid to the United States. The United States Internal Revenue Service (IRS) concedes that it overassessed the value of the Sawyer Estate, but denied a refund on the sole ground that plaintiff failed to file suit within the statutory limitations period set forth in 26 U.S.C. § 6532(a).[1] The government's motion to dismiss on the same ground, considered as a motion for summary judgment, was denied by the Hon. Albert Coffrin on May 1, 1990 because factual issues remained in dispute. Since the timeliness of a tax refund action goes to the court's jurisdiction, see *United States v. Dalm,* 494 U.S. 596, 110 S.Ct. 1361, 1368, 108 L.Ed.2d 548 (1990), trial was by court.

It is undisputed, as detailed below, that the Estate failed to file suit within the two-year limitations period as measured either from the government's initial letter "disallowing" the Estate's administrative claim, § 6532(a)(1), or from the Estate's waiver of notice, § 6532(a)(3). Nor was suit filed within the six-month written extension obtained by the Estate under § 6532(a)(2). It is also undisputed that representatives of the Estate had ongoing communications with the IRS officer handling the case that led them to believe that the Estate's claim with the IRS was being reconsidered and that its final determination awaited the resolution of a related dispute involving the Estate of Thomas Sawyer's grandfather. The only issues before the Court are whether plaintiff's reliance on the understanding it thought it had with the IRS was reasonable and, if so, whether the IRS is now estopped from raising the limitations period as a bar to suit. We answer both questions affirmatively.

## FINDINGS OF FACT

1. Thomas Sawyer died on December 4, 1979, and the following year plaintiff filed an estate tax return with the IRS.

---

1. Section 6532(a) of the *Internal Revenue Code* provides in pertinent part:

   **Suits by taxpayers for refund.—**

   **(1) General rule.—**No suit or proceeding under section 7422(a) for the recovery of any internal revenue tax, penalty, or other sum, shall be begun before the expiration of 6 months from the date of filing the claim required under such section unless the Secretary renders a decision thereon within that time, nor after the expiration of 2 years from the date of mailing by certified mail or registered mail by the Secretary to the taxpayer of a notice of the disallowance of the part of the claim to which the suit or proceeding relates.

   **(2) Extension of time.—**The 2-year period prescribed in paragraph (1) shall be extended for such period as may be agreed upon in writing between the taxpayer and the Secretary.

   **(3) Waiver of notice of disallowance.—**If any person files a written waiver of the requirement that he be mailed a notice of disallowance, the 2-year period prescribed in paragraph (1) shall begin on the date such waiver is filed.

   **(4) Reconsideration after mailing of notice.—**Any consideration, reconsideration, or action by the Secretary with respect to such claim following the mailing of a notice by certified mail or registered mail of disallowance shall not operate to extend the period within which suit may be begun.

2. On May 9, 1983, the IRS mailed to plaintiff a notice of deficiency in the amount of $119,357.52. Of this amount, $14,949.79 would be eliminated upon submission of evidence of payment of Vermont estate taxes.

3. The Estate paid the remaining $104,-407.73 and in November 1983 filed a timely claim for a refund of $104,131. The only issue in dispute was the valuation of the Estate's shares of common stock of the Great Trails Broadcasting Corporation. The Estate contended that the IRS overvalued the stock and that it was additionally entitled to a "minority discount."

4. On June 4, 1984, IRS estate tax attorney C. Kirk Clarke mailed plaintiff a letter stating that the claim for $104,131 was "disallowed." The letter stated: "The claim is based on the Estate's contention that the Internal Revenue Service valuation of Great Trails Broadcasting common stock was excessive and entirely without merit. The claim is disallowed because there is no additional information offered that would alter the determination made on audit of the Estate."

5. The decedent's grandfather, Charles R. Sawyer, died about three years after Thomas Sawyer's death. A significant tax issue during the administration of Charles Sawyer's Estate in Ohio was the valuation of Great Trails stock. The amounts at issue in the Thomas Sawyer Estate are small relative to the amounts at issue in the Charles Sawyer Estate—the latter had been assessed a deficiency of close to $8 million.

6. The IRS and the law firm representing the Ohio Estate preferred settling the Ohio dispute first.

7. The "additional information" mentioned by Clarke in the June 4, 1984 letter referred to a forthcoming resolution of the dispute over the value of the stock then pending in Ohio. Both Clarke and representatives of the Estate understood that a resolution of the controversy in Ohio would at the same time resolve the major issue in the Vermont case, namely, the proper valuation of Great Trails stock.

8. The June 4th letter was not sent by registered or certified mail and therefore did not trigger the two-year limitations period under § 6532(a)(1).

9. On September 20, 1984, the Estate completed and filed with the IRS two forms that had been forwarded to the Estate by the IRS. The first, Form 2297, is entitled "Waiver of Statutory Notification of Claim Disallowance." It states that the Estate waives the statutory requirement that a notice of disallowance be sent by registered or certified mail, and that "the filing of this waiver is irrevocable and it will begin the 2-year period for filing suit for refund of the claims disallowed as if the notice of disallowance had been sent by certified or registered mail." The second, Form 3363, is entitled "Acceptance of Proposed Disallowance of Claim for Refund or Credit."

10. Michael Flynn, the accountant for the Estate at the time, understood that the Estate, by submitting these forms, accepted the disallowance, and the consequent commencement of the two-year limitations period for filing suit, only to the extent that the value of the Great Trials stock remained in issue in the Ohio proceedings. He believed that once the Ohio matter was settled, the disallowance would be reconsidered in light of the "additional information" such settlement would provide.

11. In May of 1985, the Charles Sawyer Estate and the IRS reached a settlement on the value of the Great Trails stock. The settlement corresponded closely with the value of the stock claimed by the Thomas Sawyer Estate in the present case.

12. Michael Flynn learned of the Ohio settlement only in the fall of 1985 through a telephone conversation with an IRS agent in the Cincinnati office involved in that case. He then shared this information with Kirk Clarke at the Burlington, Vermont, IRS office. It was Flynn's understanding, based on this conversation, that the IRS was at that point reconsidering the Estate's claim for a refund of $104,131. Two years had not yet passed since the Estate had filed the Waiver of Statutory Notification.

13. An undated note written by Clarke in the Sawyer Estate file states: "Use the

same valuation as used in Cincinnati appraisal."

14. Both the Estate and the Burlington IRS office encountered considerable delay in obtaining documentation of the Ohio settlement from the Cincinnati office, and it appeared a final settlement was still pending before the IRS Appeals Office in Cincinnati. By June of 1986, the requisite documentation that would enable the Estate to settle its dispute with the IRS was not yet available.

15. At the suggestion of IRS attorney Clarke, Flynn wrote to the IRS on June 3, 1986 requesting an extension to December 4, 1986 in which to file suit. The extension was granted. Both Clarke and Flynn expected to receive the Ohio documentation in short order. In a memo to IRS District Director Joyce Weitz, dated June 4, 1986, Clarke wrote: "The taxpayers have been cooperative in all regards and are not in any way responsible for the delay in conclusion of the Ohio case which is apparently near settlement by Appellate."

16. Flynn and Jerome O'Neill, the Estate's attorney, traveled to Cincinnati on June 23, 1986, to meet with lawyers handling the Charles Sawyer Estate, in an effort to acquire the necessary documentation speedily.

17. Flynn wrote to Clarke on June 30, 1986. The letter began: "Following up on our telephone conversation last week, I'm enclosing the relevant information concerning the United States Tax Court settlement for the Estate of Charles Sawyer." The letter listed the value of the Great Trails shares agreed upon in Ohio ("settled at $10,570 per share, versus $17,000 per share as previously determined by IRS"), stated that the only outstanding issue concerned the "minority discount," and proposed a resolution of that issue. In conclusion, Flynn wrote:

> Kirk, the only information you requested that I haven't included is the Charles Sawyer Form 706 [Estate Tax Return]. We don't have a copy in Burlington and are requesting one from the Cincinnati attorneys.... Thanks for your efforts

to allow us to discuss this with you rather than having to initiate litigation.

The final sentence confirms that Flynn then believed that the IRS was actively reconsidering the previous disallowance in light of the new information.

18. On the same day, Flynn wrote to an attorney for the Charles Sawyer Estate, stating: "Kirk has requested a copy of the Charles Sawyer, Sr. Estate Tax Return, as originally filed. Although he can ultimately obtain a copy internally, that would take about three months. He's anxious to close this one, as we all are. Could you send a copy to me?"

19. On July 15, 1986, Flynn again wrote Clarke, enclosing the requested Estate Tax Return. The letter says: "I believe that this is the last of the information you requested. Let me know when you're ready to discuss settlement." Two years still had not run from the date the Estate filed its Waiver of Statutory Notification.

20. The Estate did not hear from the IRS again until after December 4, 1986.

21. Based on its correspondence with the IRS, the Estate believed that the IRS was reconsidering its prior disallowance of the claim.

22. The Estate relied on this understanding in deciding that it would be unnecessary to commence litigation prior to December 4, 1986.

23. The Court finds that the Estate's reliance on the communications of the IRS in concluding that filing suit prior to December 4, 1986 would be unnecessary to preserve its right to a refund was reasonable under the circumstances.

24. The Court further finds that the actions and communications of government attorney Clarke led the taxpayer to believe that the government was reconsidering its earlier disallowance and would modify its position upon receipt of all materials regarding disposition of the claim in the Estate of Charles Sawyer.

25. The Court finds that as of Attorney Clarke's receipt of the July 15, 1986 letter, the government had rescinded the earlier

disallowance and its attendant limitation period.

26. In late 1986, the case was reassigned from Clarke in Burlington to IRS attorney Thomas Welsh in the Albany, New York office.

27. Conversations with Welsh in early 1987 confirmed that the IRS was reconsidering the Estate's claim. Welsh requested certain further documents pertaining to the Charles Sawyer Estate, which Flynn provided on March 9, 1987.

28. On March 21, 1987, Welsh prepared and mailed to the Estate a "Report of Estate Tax Examination Changes" that was in substantial agreement with the Estate's position, based on the value for Great Trails stock determined in the Ohio proceedings and a 20 per cent "minority discount." The report concluded that the IRS owed the Estate $102,823.36.

29. On April 10, 1987, the Estate executed Form 890, which had been supplied by Welsh, accepting the amount of overassessment determined by Welsh, and mailed the form to the IRS.

30. Subsequently, on June 11, 1987, Welsh sent the Estate a letter stating that the limitations period for bringing suit had expired on December 4, 1986, and that the IRS would not allow the Estate's claim.

31. The Estate commenced suit in this Court within two years of Welsh's letter, to recover the $102,823.36, as well as $52,436 that the Estate had paid in interest,[2] plus interest on both these amounts.

## CONCLUSIONS OF LAW, OPINION AND ORDER

The government contends that this action is untimely under the provisions of 26 U.S.C. § 6532(a). The two-year period measured from the filing of the waiver of notice of disallowance, plus the written extension obtained by the Estate, expired on December 4, 1986, long before the commencement of this court action. Also, paragraph (a)(4) of the statute provides that any reconsideration by the IRS "shall not operate to extend the period within which suit may be begun."[3] The government further urges that, for a variety of reasons, the doctrine of estoppel may not be raised by the Estate to bar the IRS from enforcing the statute of limitations in this case.

We believe the government's arguments are effectively answered by the Second Circuit in *Miller v. United States*, 500 F.2d 1007 (2d Cir.1974). In *Miller*, the district court had dismissed the taxpayers' refund action on the ground that the two-year limitations period, measured from the taxpayers' execution of the waiver form (see § 6532(a)(3)), had expired. The Court of Appeals reversed and held that "the Commissioner [was] precluded from pleading the statute of limitations because he inadvertently led them to believe that their filing deadline had been extended" when, 18 months after execution of the waiver, he mailed the taxpayers a statutory notice of disallowance, which triggered its own two-year period for filing suit (see § 6532(a)(1)). *Id.* at 1008. In such confusing circumstances, it was reasonable for the taxpayers to rely on an understanding that the limitations period would begin anew with the notice of disallowance, even though the waiver signed by the taxpayers proclaimed itself to be "irrevocable."[4] As to para-

**2.** On July 29, 1985, the Estate paid $52,436 in interest that the IRS claimed was owed. Subsequently, the Estate filed a claim for the refund of that money as well as the $104,131. Counsel for the IRS concedes that the Government owes the Estate the $52,436 and that, the action for its refund having been timely filed, this Court has jurisdiction to order its return.

**3.** Paragraph (a)(4) itself is limited to reconsiderations "following the mailing of a notice ... of disallowance." In its regulation on the subject, however, the IRS added the words "or after the execution of a waiver." 26 C.F.R. § 301.6532–1(d).

**4.** In its trial brief, the Government insists that the Estate's argument "in essence" is that the waiver was revoked, adding that "it is clear that a waiver of the right to receive a statutory notification of claim disallowance is irrevocable." Brief of the United States 15. The Government misapprehends the Estate's position. The waiver, which is indeed irrevocable, merely waives the statutory requirement that notices of disallowance be sent by registered or

graph (a)(4) and its attendant regulation, the court held that "this regulation—in keeping with § 6532 as a whole—merely nullifies any *informal* reconsideration after a formal disallowance notice or waiver." *Id.* at 1010 (emphasis in original).[5] In this case, the discussions between Attorney Clarke, representing the government and the estate's accountant Flynn coupled with the letters which Flynn wrote to Clarke provide the requisite formality. Clarke told Flynn that the prior disallowance would be reconsidered and a rebate granted consistent with the disposition of the Charles Sawyer estate—once the necessary materials were supplied. Those materials were supplied under a written cover letter, which made it clear that the taxpayer, relying on Clarke's representations, expected and believed that reconsideration was underway and that a refund would shortly be granted. The fact that IRS attorney Welch later, actually prepared a report that adopted the Estate's position with respect to the Great Trails stock valuation merely underscores the reasonableness of the taxpayer's reliance. That evidence is only considered for that purpose.

Such action by the government caused the statute of limitations to begin anew and the government cannot thereafter change its mind and decide that the reconsideration wasn't really occurring so the running of the earlier statute controls. This case falls squarely within the principles enunciated in *Miller.*

The *Miller* court recognized "the somewhat more troublesome question of whether ... such inadvertence can estop the government." *Id.* The question may be troubling because holding the government accountable for the mistakes of its officials has an impact on taxpayers generally, and courts are reluctant to provide an incentive for an individual taxpayer to gain advantage from such mistakes. The posture of the present case is markedly different, however. The Estate has *not* relied on an inadvertent error; it has, rather, relied on the deliberate, commonsensical and laudable actions of IRS Attorney Clarke to postpone a final decision on the Estate's claim until settlement of the Ohio litigation. There was no error—just a course of conduct the consequences of which the IRS now seeks to avoid, to the Estate's considerable detriment.

Although the *Miller* court found the question troublesome, it nevertheless held that the government could be estopped in the circumstances. In so holding, the court noted several factors, all of which are present in the case before us. First is the absence of a finding that "the issuance of the disallowance notice ... was 'unauthorized' or even that it was contrary to con-

---

certified mail, thus permitting taxpayers to commence suit prior to such notice should they choose. The waiver is significant in that it triggers the two-year period for filing suit. The Estate's argument, however, is not that the waiver was revoked but that the Government's disallowance of the claim was revoked. If a disallowance is revoked or rescinded within the limitations period, the waiver becomes moot.

5. The inapplicability of 26 U.S.C. § 6532(a)(4) when the IRS has undertaken a *formal* reconsideration of a claim is discussed further in *Southeast Bank of Orlando v. United States,* 676 F.2d 660, 664, 230 Ct.Cl. 277 (1982) (footnote omitted):

[W]e are not persuaded by the legislative history of § 6532 that Congress intended absolutely to prohibit extension of the time via a formal reconsideration and disallowance. The problem being addressed by Congress when it enacted subsection 6532(a)(4) was that the IRS could be said to reopen a claim and yet never formally redecide it. This left the statute of limitations open indefinitely. It was the problem created by the failure to close a case that led to (a)(4), not problems created by any and all reconsiderations, no matter how formal and definite a closing or disallowance.

The House Committee Report on the bill that added the paragraph at issue states:

It is felt that when the Bureau answers letters of inquiry and extends to taxpayers the courtesy of investigating into closed files, it should not be compelled to do so at the risk of indefinitely prolonging the period of limitations. The proposed amendment it is felt will permit a more liberal treatment on the part of the Bureau of Internal Revenue in reconsidering claims for refund once they have been rejected, and will eliminate the confusion now existing as to just what constitutes reconsideration of a claim so as to extend the period of limitations.

H.R.Rep. No. 2818, 74th Cong., 2d Sess. 11 (1936), *reprinted in Southeast Bank of Orlando,* 676 F.2d at 664 n. 10.

gressional intent." The statutory scheme, the court stated, "demonstrate[s] a flexible approach." Paragraph (a)(2) " 'permits an extension of the 2–year period of limitations by an agreement in writing between the taxpayer and the Secretary or his delegate. Thus there is clear legislative recognition that the 2–year period of limitation is not inflexible.' " *Id.* (quoting *Exchange and Savings Bank of Berlin v. United States*, 226 F.Supp. 56, 58 (D.Md.1964)).

The government maintains, however, that any statements by IRS attorneys inducing reliance in this case were unauthorized, and that it cannot be bound by unauthorized acts of its employees. While this claim is made in argument, the government has introduced no evidence in support and has therefore failed to carry its burden of proof on the issue. See *Haber v. United States*, 831 F.2d 1051, 1053 (Fed.Cir.1987) ("the government's challenge to the authority of the personnel who gave the oral notice of withdrawal can not shift to taxpayer the burden of proving that the personnel were not unauthorized"), *modified in part*, 846 F.2d 1379 (Fed.Cir.1988). Thus, the situation here parallels *Miller:* conduct by IRS officials that has not been shown to be unauthorized and that is consonant with congressional intent. Unlike *Miller*, the conduct in this case was also rational.

Second, in *Miller* there was "no suggestion that anyone in the Service acted in collusion with the taxpayers to defraud the federal fisc." 500 F.2d at 1011. The same is true here. It has never been suggested, for example, that IRS Attorney Clarke purposely misinformed Mr. Flynn that the IRS was reconsidering the Estate's claim just so the Estate could later estop the government from raising the statute of limitations as a bar to recovery.

Third, the court in *Miller* concluded that its "holding does no violence to the fundamental purpose of any statute of limitations—the barring of stale claims." *Id.* Here, of course, the Estate's claim is anything but stale; indeed, all parties understood that the initial claim was *premature* in the sense that its adjudication awaited the critical "additional information" from the Ohio proceedings.

Fourth, no prejudice to the IRS could be shown in *Miller*. *Id.* Here as well, the IRS is manifestly not prejudiced by the delay, for, to repeat, it has conceded the merits of the case and will obviously not spend resources defending the claim, once the timeliness issue is resolved.

Finally, the *Miller* court found that "the taxpayers' reliance on the erroneously issued disallowance notice was not unreasonable." *Id.* As found above, the Estate's reliance on representations by IRS attorneys in the present case was similarly "not unreasonable." The Estate had every reason not to begin litigation prior to the December 6, 1986 deadline, based on its reasonable understanding that the IRS had rescinded its disallowance and was reconsidering the Estate's claim in light of the settlement of the dispute over the valuation of Great Trails stock in the Charles Sawyer Estate.

The reasoning in *Miller* was followed in *Southeast Bank of Orlando v. United States*, 676 F.2d 660, 662, 230 Ct.Cl. 277 (1982), where the court found that a refund suit was timely although the IRS had disallowed the taxpayers' claim over three years earlier, on the ground that the taxpayers and the court could reasonably view a second disallowance, issued during the interim, as incorporating a reconsideration of the claim, thus starting the limitations period anew. "[T]he time for filing should be extended when the claimant is understandably confused by a second notice of disallowance, and acts reasonably." *Id.* 676 F.2d at 664. The taxpayer's reasonable understanding of the government's communications is dispositive; whether the government in fact reconsidered the claim is relevant only insofar as it tends to establish the former. See also *Dalton v. United States*, 800 F.2d 1316, 1319 (4th Cir.1986) (citing *Miller* and *Orlando* with approval).

A second written notice of disallowance is not required as evidence that an earlier disallowance has been reconsidered. In *Haber v. United States*, 831 F.2d at 1053–54, the court held that the taxpayer could

rely on oral advice by an IRS agent that a prior notice of disallowance had been withdrawn. It would be anomalous indeed to allow an extension of time to file suit only where the government's reconsideration resulted in a second disallowance, but not where, as in this case, the government's reconsideration resulted in an *acceptance* of the taxpayer's substantive claim.

The government relies on *Office of Personnel Management v. Richmond,* —— U.S. ——, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), as support for its argument that estoppel against the government is not available to the Estate as a matter of law. The majority opinion in *Richmond* does indeed contain general sentiments disparaging estoppel claims against the government, see *id.* 110 S.Ct. at 2469–71, but the Court expressly declined to rule that an estoppel claim against the government could never succeed. *Id.* 110 S.Ct. at 2471; see also *Heckler v. Community Health Services,* 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224–25, 81 L.Ed.2d 42 (1984). The case was decided on narrower grounds—"a claim for payment of money from the Public Treasury contrary to a statutory appropriation" cannot succeed even though the claimant had relied to his detriment on erroneous advice given by a government officer, 110 S.Ct. at 2471—and those grounds are inapposite here. The Estate does not seek to obtain funds contrary to a congressional appropriation; it seeks only a recoupment of taxes that the IRS *concedes* were overpaid by the Estate. *Richmond* was decided under the Appropriations Clause of the Constitution; under that "explicit rule of decision," *id.,* "judicial use of the equitable doctrine of estoppel cannot grant respondent a monetary remedy that Congress has not authorized." *Id.* 110 S.Ct. at 2472. These fundamental constitutional concerns, dispositive in *Richmond,* do not arise in the present lawsuit.

Moreover, *Richmond* was concerned with the problem of the government's liability for misrepresentations by a government official. The present case is not

about misrepresentations. IRS Attorney Clarke's numerous communications, as admitted in testimony, indicated that a final decision on the Estate's claim awaited a resolution in the Ohio proceedings. If these communications were false, then of course the government would have been guilty of misrepresentation. But there was no evidence of this. The misconduct of the government in this case, as in *Miller* and *Orlando,* is not that it made false statements of fact to representatives of the Estate; it is that it led the Estate to believe that its claim was under reconsideration (whether or not that was the case) and then denied a refund on the false ground that the limitations period had run. This is not a case of equitable estoppel, therefore,[6] so much as it is one of promissory estoppel. See *Schmidt v. McKay,* 555 F.2d 30, 36 (2nd Cir.1977). The IRS caused the Estate to believe that the June 1984 disallowance had been withdrawn and that it was reconsidering the Estate's claim in light of the "additional information" from the Ohio litigation; the Estate reasonably relied on that belief to its detriment; and the IRS is now estopped from asserting the statute of limitations to bar the Estate's action. That is the law of this Circuit under *Miller,* and we believe it remains good law after *Richmond.* See also *Corniel-Rodriguez v. INS,* 532 F.2d 301, 302 (2d Cir.1976) (government barred by "basic notions of fairness" from deporting alien whose violation of section of Immigration and Naturalization Act was occasioned by consular officials' failure to impart crucial information to her).

The government's remaining arguments may be briefly addressed. First, it contends that estoppel cannot lie against the United States when its effect would be a burden upon the public treasury. But as we have noted, unlike *Richmond,* the Estate's claim is not an attempt to recover funds not authorized by statute, thus creating a burden on the treasury contrary to legislative will. It is, rather, an attempt to

---

**6.** The doctrine of equitable estoppel traditionally requires detrimental reliance upon "a knowing false representation of concealment of material facts." *Mukherjee v. INS,* 793 F.2d 1006, 1008 (9th Cir.1986).

enforce Congress's determination that the IRS should collect no more than it is owed. Next, the government asserts that estoppel cannot be based upon oral misrepresentations. The Estate does not base its action upon misrepresentations of any kind, however. Even were we to assume that it did, estoppel based upon oral representations is permissible under *Haber*, 831 F.2d at 1053–54. Third, the government argues that the IRS cannot "orally agree to extend the period in which suit may be filed or waive the statute of limitation." Brief of the United States 33. Again, the government misapprehends the nature of the Estate's claim. The IRS neither waived the statute nor orally agreed to extend the period from notice of disallowance or waiver in which to file suit; rather, it led the Estate to believe that it had rescinded a prior disallowance. Suit would still have to be (and was) filed within two years from any subsequent disallowance. This is not a case, for example, where an IRS agent informed a taxpayer that a claim was disallowed and that the taxpayer could file suit within three rather than two years.

Finally, citing cases for the proposition that repeated claims by a taxpayer for a refund on the same or similar grounds do not toll the statute of limitations running from the disallowance of the first claim, the government states: "We can see no reason why the taxpayer in this case (who in effect continued to submit information on his original claim) should be in any better position than a taxpayer who files repeated claims for the same refund." Brief of the United States 48 n. 14. The answer is that the Estate did not file repeated claims; it supplied additional information, as requested by the IRS, to allow the IRS to adjudicate its single claim.

Accordingly, the IRS is precluded from denying relief on the ground that the statutory limitations period had expired. Judgment is entered for the plaintiff in the amounts of $102,823.36 and $52,436.00, plus interest calculated at the government rate on both amounts.